FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUN 2 6 2025

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

KATHRYN L. SCARBOROUGH,        )
                               )
Plaintiff,                     )
                               )
                               )
v.                             )
                               )
                               )
GIRL SCOUTS OF GREATER         )
ATLANTA, INC.,                 )
                               )
Defendant.                     )

**1:25-CV- 3584**

Case NO. _____

**JURY TRIAL DEMANDED**

### COMPLAINT FOR DISABILITY DISCRIMINATION, RETALIATION, AND WRONGFUL TERMINATION

#### PRELIMINARY STATEMENT

1. This is a case about an employer's relentless campaign of discrimination and retaliation against a loyal, long-serving employee with well-documented disabilities. For years, Plaintiff Kathryn Scarborough's supervisors at Girl Scouts of Greater Atlanta, Inc. were fully aware of her mental health conditions. Rather than offering support,

1

Defendant allowed and enabled a pattern of mocking, humiliation, and invasive conduct that targeted Plaintiff's disabilities and repeatedly undermined her dignity and legal rights. The harassment, which began as early as 2022, only escalated after Plaintiff formally complained to Human Resources—culminating in acts of retaliation, public exposure of confidential medical information, and ultimately Plaintiff's forced resignation and abrupt termination. Defendant's conduct was knowing, deliberate, and in flagrant violation of the ADA, FMLA, and Georgia law. Plaintiff seeks to hold Defendant fully accountable for the harm caused by its unlawful and callous actions.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as they are so related to the federal claims that they form part of the same case

or controversy.

3. Venue is proper in this district pursuant to 28 U.S.C. §
   1391(b) because a substantial part of the events or
   omissions giving rise to the claims occurred in this
   judicial district, and Defendant resides in this district.

4. Plaintiff has satisfied all administrative prerequisites
   to filing suit. Plaintiff formally filed a charge of
   discrimination with the Equal Employment Opportunity
   Commission ("EEOC") on March 6, 2025, and was issued a
   Notice of Right to Sue on April 1, 2025. A true and correct
   copy of that Notice is attached as **Exhibit A.**

**PARTIES**

5. Plaintiff Kathryn L. Scarborough is a citizen of the United
   States and a resident of Roswell, Georgia. At all times
   relevant to this action, Plaintiff was an employee of
   Defendant within the meaning of the ADA and FMLA.

6. Defendant Girl Scouts of Greater Atlanta, Inc. is a non-
   profit corporation organized under the laws of Georgia with
   its principal place of business at 5601 North Allen Road
   SE, Mableton, GA 30126. Defendant is an employer within the
   meaning of the ADA and FMLA, employing more than 50
   employees for each working day in each of 20 or more

3

calendar weeks in the current or preceding calendar year.

### STATEMENT OF FACTS

7. Plaintiff began her employment with Defendant in August 2017 as an Area Executive and was later promoted to Regional Executive in September 2021.

8. Prior to her complaints in December 2023, Plaintiff had never been subject to formal disciplinary action and had received consistently positive performance reviews, including the mid-year 2024 review.

9. Plaintiff has disabilities as defined by the ADA, including anxiety, depression, and ADHD, which substantially limit one or more major life activities. These conditions have been continuously documented and treated through psychiatric care since 2022, with clinical notes consistently discussing Plaintiff's workplace issues and attributing symptom exacerbation to the workplace events (e.g., Clinical notes from visits on 12/13/2023, 05/16/2024, 09/17/2024, and 01/09/2025).*

*Full records available via subpoena; provided summaries avoid unnecessary disclosure of sensitive health information under O.C.G.A. §50-18-72.

10. Beginning in November 2022, Supervisor Krystal Pickett engaged in targeted harassment of Plaintiff's disabilities, including:

   a. Mocking Plaintiff's mental health during a November 2022 incident where she sarcastically asked if Plaintiff was "stressed and depressed," then interrupted her response by stating she was instructed to "ask me and watch my face";

   b. Dismissing Plaintiff's stress as mere "fatigue from a trying team" during the same interaction, undermining her disability;

   c. Regularly disparaging individuals with mental health conditions as "faking" their disabilities to avoid accountability, as documented in Plaintiff's October 23, 2024, formal complaint to Chief Administrative Officer Jennifer Caraballo. A true and correct copy of this complaint is attached as **Exhibit B.**

11. Plaintiff verbally reported these incidents to the Chief Administrative Officer, Jennifer Caraballo, in or about December 2023, expressing concern about Ms. Pickett's attitude toward mental health issues. Plaintiff and Ms. Caraballo arranged to meet at a coffee shop on December 6, 2023, to discuss Plaintiff's concerns. During this meeting, Ms. Caraballo

acknowledged that some of these concerns were legitimate but suggested some might be due to an "amygdala hijack" or Plaintiff's "own sensitivities."

12. In or about early January 2024, Ms. Pickett repeatedly asked Plaintiff "what was wrong" with her and if she was "ill." Later that day, when Plaintiff disagreed with something Ms. Pickett said, Ms. Pickett exclaimed, "now I KNOW there's something wrong with you!"

13. On or about April 29, 2024, Plaintiff and Ms. Caraballo held a Microsoft Teams meeting to again discuss concerns about Ms. Pickett's behavior, including overnight messages, urgent messages during sick and personal time, and comments suggesting Plaintiff should prioritize work over family. The response was merely to advise Plaintiff to mute her Teams messages.

14. Despite Plaintiff's good-faith use of Defendant's internal complaint procedures, Defendant's response to each complaint was dismissive, inadequate, and ultimately enabled the discrimination to continue and escalate.

15. Specifically, Defendant's complaint process itself became a vehicle for further harm when:

   a. Ms. Caraballo dismissed Plaintiff's concerns by

suggesting they were due to "amygdala hijack" or Plaintiff's "own sensitivities" rather than legitimate discrimination;

b. Human Resources advised Plaintiff to simply "mute Teams messages" rather than addressing the harassing behavior of her supervisor;

c. Defendant's inadequate responses emboldened Ms. Pickett, who escalated her discriminatory conduct after each complaint, demonstrating that Defendant's complaint procedures were not reasonably designed to prevent or correct harassment.

16. On or about October 2022, Human Resources suggested that Plaintiff be more open with Ms. Pickett regarding my anxiety disorder. After sharing some personal information about her condition, Ms. Pickett increasingly made comments regarding Plaintiff's medication for her conditions. Specifically, whenever Ms. Pickett commented on Plaintiff's good mood, Plaintiff would say in jest that she "must have taken all of her meds this morning," Ms. Pickett would visibly cringe and say, "Oh no, not THAT."

17. Beginning in or around December 2023, after Plaintiff discussed her concerns with the interim CEO, Ms. Pickett

repeatedly made comments with increasing frequency about job security that appeared directed at Plaintiff, including "no one's job is safe right now" while looking directly at Plaintiff. These actions further targeted Plaintiff's anxiety disorder.

18. In September 2024, Plaintiff required medical leave under the FMLA due to the severe impact the hostile work environment had on her mental health, as clinically documented by a psychiatric evaluation on 09/17/2024 that cited acute panic attacks and work-triggered deterioration necessitating excused absence.

19. Plaintiff returned from FMLA leave on October 7, 2024.

20. Upon her return, Plaintiff discovered Ms. Pickett had been granted unrestricted access to her email account during her leave, including access to emails containing confidential medical information and communications with Human Resources regarding Plaintiff's FMLA leave. Given the circumstances of Plaintiff's FMLA leave, her mental health provider explicitly stated in a letter that Plaintiff was not to have any contact with Ms. Pickett during her leave. This letter was confidential medical information shared with Human Resources; however, by giving Ms. Picket full access to Plaintiff's emails without any

8

precautions in place to protect this confidential material, Ms. Pickett had access to this documentation which may have in part led to the retaliation after Plaintiff's return.

21. Plaintiff immediately, on October 7, 2024, notified Ms. Caraballo in writing regarding this breach of medical confidentiality.

22. Following Plaintiff's return from FMLA leave, Ms. Pickett began retaliating against her in several ways, including:

    a. Publicly announcing during a department meeting with approximately 25 colleagues present during the week of October 13, 2024, that she was thanking individuals who covered Plaintiff's work "while she was out on leave," drawing attention to the medical nature of the Plaintiff's absence;

    b. Making reference to medical leave policies in hiring interviews, which she had never done previously;

    c. Increasing scrutiny of Plaintiff's work performance;

    d. Reassigning several of Plaintiff's core responsibilities to other employees, including—but not limited to—(i) assigning cases to all Area Executives, (ii) selecting the annual Spring Renewal Incentive, (iii) assigning troop numbers to new and reorganized

9

troops, (iv) participating in the planning of major events and conferences, and (v) opening department meetings with team-building and mental-health activities. Plaintiff had, prior to this sudden reassignment, received consistently positive feedback for her performance in each of these areas.

This retaliation exacerbated Plaintiff's mental health conditions, evidenced by increased medication adjustments and persistent job-related stress documented in psychiatric notes (e.g., visits on 11/21/2024 and 01/09/2025).

23. On October 21, 2024—immediately after Plaintiff took a single sick day—Ms. Pickett sent Plaintiff an email with an unmistakably punitive tone that stripped Plaintiff of every duty listed in sub-paragraph 23(d) "until further notice" and chastised her with a performance-focused message. This wholesale removal of duties, despite Plaintiff's documented success and favorable evaluations in those exact tasks, marked a clear escalation of the ongoing retaliation.

24. On October 23, 2024, Plaintiff submitted a detailed formal complaint to Human Resources, documenting the pattern of discrimination, harassment, and retaliation she

had experienced.

25. On November 21, 2024, Ms. Caraballo issued a letter stating that an internal investigation had found "no evidence of unlawful activity" without addressing the specific allegations Plaintiff had raised.

26. On November 25, 2024, and December 1, 2024, Plaintiff responded to the investigation's conclusion, clearly identifying deficiencies in the investigation and requesting additional details about how her allegations were evaluated. In addition to Ms. Caraballo, Defendant's CEO and COO were copied on these communications.

27. On or about November 22, 2024, when Plaintiff inquired about a potential transfer to an open position in another department as a possible resolution, she was directed to discuss the matter with Ms. Pickett, the very supervisor against whom she had filed her complaint.

28. Due to the increasingly hostile and intolerable working conditions — which had long been documented as a primary contributor to Plaintiff's declining mental health (e.g., 05/16/2024, 08/22/2024 visit notes) — Plaintiff submitted her resignation to Human Resources on January 15, 2025, citing Constructive Discharge and providing four weeks' notice with her last day to be February 13, 2025. By this

time, Plaintiff would have panic attacks leading up to any scheduled meeting with Ms. Pickett due to her enhanced scrutiny and treatment of Plaintiff.

29. Instead of allowing Plaintiff to work through her notice period, Defendant abruptly terminated her employment on January 23, 2025, constituting a further act of retaliation.

30. Subsequently, the Georgia Department of Labor, after reviewing the circumstances, determined Plaintiff "quit with a good work-connected reason" because the intolerable situation "made the job unsuitable," thereby validating her claim for unemployment benefits. A true and correct copy of the Georgia Department of Labor Determination is attached as **Exhibit C**.

### COUNT I

**DISABILITY DISCRIMINATION AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA)**

31. Plaintiff incorporates by reference paragraphs 1 through 30 of this Complaint as if fully set forth herein.

32. Plaintiff has disabilities as defined by the ADA, including anxiety, depression, and ADHD, which substantially limit one or more major life activities.

12

33. Defendant was aware of Plaintiff's disabilities through direct communication from Plaintiff and notifications to Human Resources.

34. Plaintiff was qualified for her position and could perform the essential functions of her job with or without reasonable accommodation.

35. Defendant, through its agents and supervisors, subjected Plaintiff to unlawful discrimination because of her disabilities. This discrimination took the form of a severe and pervasive hostile work environment, which altered the terms and conditions of Plaintiff's employment.

36. The unwelcome harassment based on Plaintiff's disabilities included, but was not limited to:

   a. Mocking comments about her mental health conditions and prescribed medication, such as cringing and stating, "Oh no, not THAT";

   b. Sarcastic inquiries about being "stressed and depressed" while being instructed to "watch [Plaintiff's] face";

   c. Disparaging comments suggesting that individuals with mental health conditions were "faking" them;

   d. Repeatedly threatening Plaintiff's job security to

13

target her known anxiety disorder including during a
one-on-one meeting in Summer 2024 in which Ms. Pickett
told Plaintiff that she was aware of a coworker's
efforts to find other employment because Human
Resources was keeping a list of employees whose
LinkedIn profiles indicated that they were open to
new opportunities; and

   e. Publicly disclosing and drawing attention to her FMLA
   leave status upon her return to work.

37. The harassment was so severe and pervasive that it created
    a discriminatorily abusive and intolerable work
    environment for a reasonable person in Plaintiff's
    position.


38. Defendant knew or should have known about the harassment.
    Plaintiff placed Defendant on actual notice through
    numerous good-faith complaints to Human Resources and
    senior management, beginning on or around November 2022.

39. Despite this knowledge, Defendant failed to take prompt
    and appropriate corrective action. Instead, Defendant's
    responses were dismissive and ineffective, thereby
    ratifying the supervisor's conduct. Defendant's sham
    investigation and failure to address specific allegations

made further use of its internal complaint procedures futile.

40. The hostile and discriminatory environment ultimately became so intolerable that Plaintiff was forced to submit her resignation on January 15, 2025, constituting a constructive discharge.

41. Defendant's subsequent decision to abruptly terminate Plaintiff's employment on January 23, 2025, after she provided a four-week notice period, constituted a final adverse employment action.

42. As a direct and proximate result of Defendant's discriminatory actions, creation of a hostile work environment, and constructive and actual discharge of Plaintiff, she has suffered and continues to suffer damages, including but not limited to lost wages and benefits, emotional distress, mental anguish, humiliation, and loss of enjoyment of life.

**COUNT II**

**RETALIATION IN VIOLATION OF THE ADA**

43. Plaintiff incorporates by reference paragraphs 1 through 42 of this Complaint as if fully set forth herein.

44. Plaintiff engaged in protected activity under the ADA by:

   a. Reporting disability discrimination to Human

15

Resources in December 2023, as detailed in paragraph 12;

b. Reporting the unauthorized access to her confidential medical information on October 7, 2024, as detailed in paragraph 22;

c. Filing a formal complaint regarding disability discrimination on October 23, 2024, as detailed in paragraph 25.

45. Defendant took adverse employment actions against Plaintiff in retaliation for her protected activity, including:

a. Increasing scrutiny of her work;

b. Reassigning her job duties;

c. Constructively discharging and ultimately terminating her employment.

46. There is a causal connection between Plaintiff's protected activity and the adverse employment actions.

47. As a direct and proximate result of Defendant's retaliatory actions, Plaintiff has suffered and continues to suffer damages, including but not limited to lost wages and benefits, emotional distress, mental anguish, humiliation, and loss of enjoyment of life.

## COUNT III

## INTERFERENCE IN VIOLATION OF THE FMLA

48. Plaintiff incorporates by reference paragraphs 1 through 47 of this Complaint as if fully set forth herein.

49. Plaintiff was an eligible employee under the FMLA.

50. Defendant was a covered employer under the FMLA.

51. Plaintiff was entitled to leave under the FMLA due to her serious health conditions.

52. Defendant interfered with Plaintiff's FMLA rights by:

   a. Failing to secure Plaintiff's confidential medical information which not only violated the FMLA's confidentiality provisions under 29 C.F.R. § 825.500(g), but also constituted an independent violation of the Americans with Disabilities Act, 42 U.S.C. § 12112(d), which mandates strict confidentiality of medical information obtained in connection with disability-related inquiries or accommodation requests.;

   b. Publicly commenting on her medical leave which discouraged future FMLA use, violating 29 C.F.R. § 825.220(b);

   c. Creating a hostile environment upon her return that

17

interfered with her rights.

53. As a direct and proximate result of Defendant's interference with her FMLA rights, Plaintiff has suffered and continues to suffer damages, including but not limited to lost wages and benefits.

## COUNT IV

### RETALIATION IN VIOLATION OF THE FMLA

54. Plaintiff incorporates by reference paragraphs 1 through 53 of this Complaint as if fully set forth herein.

55. Plaintiff engaged in protected activity under the FMLA by taking approved medical leave.

56. Defendant took adverse employment actions against Plaintiff in retaliation for her protected activity, including:

   a. Publicly highlighting her absence on medical leave;

   b. Reassigning her job duties;

   c. Increasing scrutiny of her work;

   d. Creating intolerable working conditions that forced Plaintiff to resign;

   e. Terminating her employment when she attempted to work through her notice period.

57. There is a causal connection between Plaintiff's protected activity and the adverse employment actions, as evidenced by the timing and circumstances of the adverse actions immediately following her return from FMLA leave. The adverse actions, occurring within weeks of Plaintiff's return on October 7, 2024, demonstrate a retaliatory motive.

58. The retaliatory conduct escalated to the point where a reasonable person would find the working conditions intolerable, forcing Plaintiff to submit her resignation on January 15, 2025, which constituted constructive discharge.

59. The Georgia Department of Labor's determination that Plaintiff quit with "good work-connected reason" confirms that the resignation was involuntary and resulted from Defendant's retaliatory conduct.

60. As a direct and proximate result of Defendant's retaliatory actions, Plaintiff has suffered and continues to suffer damages, including but not limited to lost wages and benefits.

**COUNT V**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Georgia State Law - Supplemental Jurisdiction)**

61. Plaintiff incorporates by reference paragraphs 1 through 60 of this Complaint as if fully set forth herein.

62. Defendant, through its supervisor Ms. Pickett and with the knowledge and ratification of senior management, engaged in extreme and outrageous conduct that was intentional and calculated to cause severe emotional distress to Plaintiff.

63. Ms. Pickett had specific knowledge of Plaintiff's mental health vulnerabilities, including her diagnosed anxiety, depression, and ADHD, having been informed of these conditions both directly by Plaintiff and through Human Resources communications.

64. Despite this knowledge, Ms. Pickett, as Plaintiff's direct supervisor, wielded authority to exploit Plaintiff's vulnerabilities through:

   a. Mockingly asking if Plaintiff was "stressed and depressed" while stating she was told to "watch [Plaintiff's] face" when asking;

   b. Repeatedly cringing and saying "Oh no, not THAT" when Plaintiff referenced taking her prescribed

medications;

c. Making statements suggesting people with mental
health conditions were "faking" to avoid
accountability;

d. Deliberately creating anxiety by repeatedly stating
"no one's job is safe" while looking directly at
Plaintiff, knowing of her anxiety disorder;

e. Gaining unauthorized access to Plaintiff's
confidential medical communications during FMLA
leave.

65. This conduct represents a deliberate pattern of
escalation that intensified despite Defendant's knowledge
of the severe impact on Plaintiff's mental health,
including:

a. Plaintiff's multiple reports to Human Resources
beginning in December 2023;

b. Plaintiff's need for FMLA leave in September 2024 due
to the hostile environment's impact on her mental
health;

c. Plaintiff's documented communications expressing the
severe distress caused by this treatment.

21

66. Defendant demonstrated deliberate indifference to this ongoing harassment by:

   a. Dismissing Plaintiff's concerns as "amygdala hijack" or her "own sensitivities";

   b. Advising Plaintiff to simply "mute Teams messages" rather than addressing the harassment;

   c. Conducting a sham investigation that failed to address specific documented incidents;

   d. Directing Plaintiff to discuss transfer opportunities with the very supervisor who was harassing her.

67. The conduct was so extreme and outrageous as to exceed all bounds of decency tolerated in civilized society, particularly given:

   a. The abuse of the supervisor-subordinate relationship;

   b. The deliberate exploitation of known mental health vulnerabilities;

   c. The violation of medical privacy during FMLA leave; and

   d. The sustained nature of the conduct over multiple years despite knowledge of harm.

68. As a direct and proximate result of Defendant's intentional infliction of emotional distress, Plaintiff

suffered severe emotional distress requiring medical intervention, including:

    a. Exacerbation of her anxiety and depression requiring FMLA leave;

    b. Ongoing mental health treatment;

    c. Severe psychological distress manifesting in physical symptoms;

    d. Inability to continue employment despite seven years of dedicated service.

69. Defendant's conduct was willful, malicious, and showed a complete disregard for Plaintiff's rights and wellbeing, warranting the imposition of punitive damages under Georgia law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Grant judgment in favor of Plaintiff and against Defendant on all claims;

2. Award Plaintiff back pay, including lost wages, bonuses, and benefits in the amount of $31,137 representing the value of lost pay and benefits from Plaintiff's date of termination until starting a new position on May 30, 2025;

23

3. Award Plaintiff front pay in lieu of reinstatement in the amount of not less than $52,393 and not more than $72,631 (representing five- to seven-years future wage losses discounted to present value), or such other amount as the Court deems just and equitable.

4. Award Plaintiff compensatory damages in an amount to be determined at trial and up to the maximum allowed by 42 U.S.C. § 1981a(b)(3) for emotional distress, mental anguish, humiliation, and loss of enjoyment of life;

5. Award Plaintiff Punitive damages in an amount to be determined at trial and up to the maximum allowed by 42 U.S.C. § 1981a(b)(3) for Defendant's malicious or recklessly indifferent conduct which is supported by the fact that two CEOs and the COO were notified of the conduct but failed to intervene;

6. Award Plaintiff punitive damages, including those available under Georgia law for intentional torts;

7. Award Plaintiff Liquidated damages under the FMLA in an additional amount equal to the sum of Plaintiff's back-pay, benefits, and interest pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii);

8. Award of reasonable attorneys' fees should Plaintiff retain counsel, and the costs of this action under 42 U.S.C.

§ 12205 and 29 U.S.C. § 2617(a)(3);

9.  Award Plaintiff pre-judgment and post-judgment interest as provided by law;

10. Grant such other and further relief as the Court deems just and proper.


Plaintiff hereby demands trial by jury on all issues so triable. Respectfully submitted this 25th day of June 2025.


Kathryn L. Scarborough
Plaintiff Pro Se
4392 Old Mabry Place
Roswell, GA 30075
770-490-0162
katyscarborough@gmail.com

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 5.1, the undersigned, attaches this

Certificate of Compliance This 25th day of June 2025.

Kathryn L. Scarborough
Plaintiff Pro Se
4392 Old Mabry Place
Roswell, GA 30075
770-490-0162
katyscarborough@gmail.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**EXHIBIT A – EEOC Right to Sue Letter**

Respectfully submitted,

Kathryn L. Scarborough
4392 Old Mabry Place
Roswell, GA 30075
770-490-0162
katyscarborough@gmail.com
Pro Se Plaintiff

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Atlanta District Office
100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
1-800-669-4000
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

**To:** Mrs. Kathryn L. Scarborough
4392 Old Mabry Place
Roswell, GA 30075
Charge No: 410-2025-01747

EEOC Representative and email:    MICHELLE WRIGHT
Investigator
michelle.wright@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 410-2025-01747.

On behalf of the Commission,

I. Daniel-
Edward Anance

Digitally signed by I.
Daniel-Edward Anance
Date: 2025.04.01

Darrell E. Graham
District Director

**Cc:**
Jennifer Caraballo
5601 North Allen Road
Mableton, GA 30126

Tracie Maurer
Jackson Lewis P.C.
171 17th Street NW
Atlanta, GA 30363

5601 North Allen Road
MABLETON, GA 30126

Najmah James
Jackson Lewis
171 17th St Suite 1200
Atlanta, GA 30363


Please retain this notice for your records.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**EXHIBIT B – Formal Complaint to HR, dated October 23, 2024**

Respectfully submitted,

Kathryn L. Scarborough
4392 Old Mabry Place
Roswell, GA 30075
770-490-0162
katyscarborough@gmail.com
Pro Se Plaintiff

October 23, 2024

Jennifer Caraballo, SHRM-CP
Chief Administrative Officer
Girl Scouts of Greater Atlanta
5601 N. Allen Road SE
Mableton, GA 30126

Dear Ms. Caraballo:

I am writing to file a formal complaint regarding ongoing disability discrimination, harassment, retaliation, and medical privacy violations by my supervisor, Krystal Pickett. This letter documents violations of the Americans with Disabilities Act (ADA), Family and Medical Leave Act (FMLA), and multiple Girl Scouts of Greater Atlanta policies as outlined in the Employee Handbook.

I have documented mental health conditions (depression, anxiety, and ADHD) that qualify as disabilities under the ADA. I have previously disclosed these conditions to HR and requested reasonable accommodations, including confidentiality regarding my medical information. I recently took protected FMLA leave for medical treatment. I have also engaged in protected activity by reporting discrimination and harassment related to my disabilities on multiple occasions.

On October 8, 2024, I returned to work after a period of Family and Medical Leave. Upon my return, I discovered that my supervisor, Krystal Pickett, had been granted unrestricted access to my email account during my absence. This access included emails containing sensitive medical information, such as communications with Human Resources regarding my health condition and a letter from my mental health care provider. I believe this constitutes a violation of my right to medical confidentiality and breaches the Electronic Communication and Information Systems Policy, which, while specifying that emails are company property, also emphasizes the importance of privacy and propriety in accessing employee emails.

Medical Privacy Violations

The company violated my medical privacy rights during my recent FMLA leave by:

1. Granting Ms. Pickett unrestricted access to my email account containing confidential medical information, despite:

   - My explicit previous requests for medical confidentiality from Ms. Pickett
   - The existence of less intrusive methods to manage workflow
   - Known concerns about Ms. Pickett's attitude toward mental health conditions

2.  Failure to adequately protect my medical information as required by:

- The ADA's confidentiality requirements for medical information
- FMLA's protection of medical certifications and records
- Company policies regarding medical privacy

Policy Violations

These actions violate multiple company policies including:

- Anti-Harassment Policy (handbook p.34)
- Anti-Retaliation Policy (handbook p.21)
- Equal Employment Opportunity Policy (handbook p.30)
- Accommodation Policy (handbook p.31)
- FMLA Policy (handbook p.104)

Since November 2022, I have experienced several instances of unprofessional conduct and harassment from Ms. Pickett. She has made inappropriate comments about my mental health, including asking if I was "stressed and depressed" in a sarcastic tone. She has also made derogatory remarks about other employees' mental health, suggesting that they might be "faking" their conditions. These comments have caused me significant distress and affected my ability to perform my job professionally.

I have previously raised these concerns verbally with HR and was assured that Ms. Pickett would be coached. However, the harassment has persisted, and I have reason to believe that Ms. Pickett is retaliating against me for raising these issues. Additionally, she has made comments about job security that seem targeted at me, causing me further anxiety and distress. During a one-on-one meeting during the Summer of 2024, I mentioned that one of my direct reports was looking for other employment opportunities to which Ms. Pickett replied that she was aware because Human Resources was actively maintaining a list of currently employees whose LinkedIn profiles indicated that they were open to new opportunities. At the time my profile had this feature activated which made the comment feel like a veiled threat or warning.

Since returning from my FMLA leave, I have noticed a marked shift in Ms. Pickett's behavior toward me, which I interpret as retaliatory. These actions have included, but are not limited to:

- Krystal made a public announcement in a department meeting thanking others for covering my tasks while I was on medical leave, drawing unnecessary attention to my absence, despite acknowledging that she had already privately thanks these individuals.
- During interviews, Krystal has often referenced "trips around the world" and

other examples when discussing what is and is not acceptable time off during her defined blackout periods. I found it notable to say the least that for the first time in my presence she referenced needing medical leave during an interview last week. She included it with the "acceptable" reasons, but her tone, and the fact that she has never mentioned it before, seemed to betray the intention of the statement.

This behavior aligns with retaliation, as defined in our company's Anti-Retaliation Policy, and I fear it will only escalate if not addressed.

Last November, we went through Ignite leadership training. We discussed the forum being a safe and brave space. I took that in earnest and expressed the challenges of being a leader with my diagnoses. I also expressed that I felt like the RE team doesn't have a say in setting our goals. My next few one-on-one meetings were extremely adversarial, distressing, and upsetting, often running over scheduled time by up to two hours. I expressed my discomfort to Kat, as Krystal had mentioned several times to me that you were accountability buddies and that she and you go "way back". I believe she did that to discourage me from discussing her actions with you. Kat said that you and I would still need to meet and talk about it. We met the morning of December 6th, 2023, and I outlined this history with you, as well as several other instances where I felt very distressed and concerned about Krystal's behavior since my promotion in August of 2021. I specifically recall discussing her attitude towards mental health, as I shared some of the things she said about Rebecca before her employment was terminated. Her comments suggested that Rebecca had been faking her mental illness to garner sympathy and avoid accountability. She said people do this because "you can't really prove it one way or another."

Your response was that you believed some of these things were legitimate and concerning, while also suggesting that some of the actions may have been my interpretation, due to an amygdala hijack or my own sensitivities. I felt really conflicted about whether or not I was taken seriously or being brushed off.

I shared via Teams an exchange from early January of this year, where she repeatedly asked what was wrong with me and if I was ill. When I disagreed with something she said later in the day, she exclaimed "now I KNOW there's something wrong with you!"

In April 2024, Kat invited my oldest daughter and I to attend the Opening Night at Heart Stings. Krystal took credit for suggesting that my daughter and I attend, but I later came to question her intentions, as this seemed to trigger more upsetting behaviors from Krystal. You and I had a conversation a week after the event, that Krystal's behavior, including overnight messages the night of the event, urgent messages during sick, vacation and personal time, etc, were of concern to me. Your response was to advise me to mute messages, which did not address the underlying issue of Krystal's invasive behavior.

Krystal's reaction to my needing to take a sick day on Monday was exactly what I feared in terms of retaliation and escalation. I had been up most of the night with a fever and coughing and had scheduled a doctor's appointment for the morning. I am happy to provide the doctor's note as verification, if necessary. On Tuesday I returned to find an email reviewing last week's one-on-one meeting and outlining follow-ups for next week, since I missed our regular Monday meeting while out sick. While our previous week's one-on-one meeting had been casual enough for her to make inappropriate remarks about young recruitment candidates (referring to them as "hood twins"), this email adopted a punitive tone. The timing is significant: immediately following my legitimate use of a sick day and closely following my return from FMLA medical leave, Krystal simultaneously reassigned all my RE tasks "until further notice" and issued a stern performance-focused email. This response occurred despite my following proper notification procedures and coincided with Latangia's unusual Teams inquiry about the reason for my absence. The sequence of events – returning from FMLA leave and taking a legitimate sick day, followed immediately by task reassignment, heightened scrutiny, and a documented shift in treatment - demonstrates a clear pattern of adverse employment actions directly linked to my use of protected medical leave.

It was my sincere hope that as a dedicated, loyal employee, and strong supporter of the Girl Scout mission, I would be afforded reasonable support, respect, and protection. As documented above, my concerns seem to have been dismissed and the concerning behavior was allowed to continue unabated, despite the company being notified and aware of the issues for at least two years.

Given the severity of these issues, I respectfully request the following:

1. A review of my current reporting structure, as I am no longer comfortable working under Ms. Pickett's supervision.
2. Assurance that no further retaliation will occur as a result of this complaint.

I am prepared to discuss and review any suggestions you may have on how to move forward and resolve the issues and concerns documented in this letter. Currently, I am not sure that I am comfortable having these discussions in person and request that communication regarding these matters be in writing for the time being.

Sincerely,

Katy Scarborough
Regional Executive
Girl Scouts of Greater Atlanta

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**EXHIBIT C – Georgia Department of Labor Unemployment Determination**

Respectfully submitted,

Kathryn L. Scarborough
4392 Old Mabry Place
Roswell, GA 30075
770-490-0162
katyscarborough@gmail.com
Pro Se Plaintiff

 Georgia Department of Labor

Georgia Department of Labor

## CLAIMS EXAMINER'S DETERMINATION

| **Claimant ID:** 4886640 | **Mail Date:** 02/28/2025 |
| --- | --- |
| | **Appeal Rights Expiration Date:** 03/15/2025 |

**This eligibility determination applies to claim Benefit Year Begin (BYB) Date:** 02/09/2025

**The effective date of this determination is** 02/09/2025.

| **Claimant Name:** KATHRYN L SCARBOROUG<br>**Claimant Mailing Address:**<br>4392 OLD MABRY PL NE<br>ROSWELL, GA, 30075 | **This determination is based on employment with the following employer:**<br>**Employer Name:** GIRL SCOUTS OF GREATER ATLANTA<br>**Employer Benefits Mailing Address:** 3210 SAVILLE ST SW<br>PO BOX 283,<br>ST LOUIS, MO, 63166 |
| --- | --- |

### Claim Determination

You are eligible as of 02/09/2025.

### Reasoning

You quit because of difficulty with a subordinate. To be paid benefits you must show the situation made the job unsuitable, and you did everything you could to remain employed. Your employer must be given the opportunity to correct the problem. The available facts show the above conditions were met. You quit with a good work-connected reason. Therefore, you can be paid unemployment benefits.

### Legal Basis for Determination

Section 34-8-194(1) of the Georgia Employment Security Law says that if you quit your most recent employer without a good reason connected with the work, you cannot be paid unemployment benefits. The law says that you have to show that you quit for good work-connected reason. The law also says you can be paid unemployment benefits if your employer offers a layoff due to lack of work, and you accept it. You can also be paid if you quit because your spouse was reassigned from one military assignment to another. Additionally, the law states you may be paid if you have established with reasonable evidence that you quit your most recent employer due to family violence, as that term is defined in O.C.G.A. 19-13-1. If you cannot be paid unemployment benefits under this section of the law, you may qualify at a later time. To do this, you must find other work and earn wages covered under unemployment law. The covered wages must be at least ten times the weekly amount of your claim. If you then become unemployed through no fault of your own, you may reapply for unemployment benefits.

### Appeal Rights

This determination becomes final unless you file a request for an appeal on or before 03/15/2025. If you wish to file an appeal, you must submit a written request either online , by email to appeals@gdol.ga.gov or fax to 404-232-3901 or 404-232-3902. You must continue to request a benefit payment weekly, or you will not be paid if you win your appeal. You will be required to repay the benefits received during the disqualification period, if a determination allowing benefits is reversed by an appeal decision. You may find more details here or by contacting Customer Service or your local career center.

▶ More information

dol georgia gov | Diagnostic | Human Trafficking Notice